**HAMILTON GAS CO. et al. v. INLAND GAS CORPORATION et al.**

**PINEY OIL & GAS CO. v. SAME.**

**Nos. 7530, 7669, 7531, 7670.**

Circuit Court of Appeals, Sixth Circuit.

March 13, 1939.

Stanley C. Morris, W. E. Miller, W. J. Maier, Jr., and Steptoe & Johnson, all of Charleston, W. Va., for appellants.

George W. Jaques, of New York City, Robert T. Caldwell and LeWright Browning, both of Ashland, Ky., Milbank, Tweed & Hope, of New York City, and Caldwell & Gray, of Ashland, Ky., for appellees.

132

Before SIMONS, ALLEN, and HAMILTON, Circuit Judges.

SIMONS, Circuit Judge.

Both appellants are gas producing companies operating in Kentucky. The appellee is a pipe line company in receivership superseded by reorganization proceedings under § 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. The controversies grow out of contracts entered into in .1927 whereby the debtor undertook to .construct a pipe line from the vicinity of leaseholds belonging to appellants in Kentucky, to Ashland, and agreed to purchase from appellants certain minimum quantities of gas to be delivered into its pipe line at progressive contract rates. The appeals are from orders denying claims to priority by the appellants asserted (1) on the theory that the contracts were for the use, benefit and enjoyment by the appellants of the debtor's property as a unique facility for marketing their gas and so gave them equitable liens thereon to secure them against loss by reason of breach of contract (7530, 7531), and (2) that damages suffered by the appellants during the operation of the debtor's properties by the receiver are receivership expenses (7669, 7670).

## Nos. 7530, 7531.

In 1927 the debtor was organized as a pipe line company to take over contracts which had been entered into by one Alfred Howell with the appellants for the purchase of gas produced from leaseholds operated by them in Floyd and Pike Counties, Kentucky. The agreements, substantially identical, obligated the vendee to construct, equip, and maintain a twelve-inch pipe line from. Eastern, Kentucky to Ashland and other parts, and to extend lines to delivery points in the areas developed by the wells of the appellants. The vendee agreed to take from Piney after the termination of its contract with Louisville Gas & Electric Company a minimum of 10,000,000 cubic feet per day, and from Hamilton a minimum of 8,-000,000 feet per day, the sellers to have the option to cancel their contracts on fifteen days' notice. On completion of the pipe line, compressors, and other equipment, the debtor began to take gas from the wells of the appellants and to deliver it to consumers in Ashland and vicinity. Performance followed, though not to the letter, until December 2, 1930.

As of February 1, 1928, the debtor executed and delivered to trustees a mortgage securing gold bonds therein described. The indenture provided that the lien securing the bonds issued thereunder was "expressly subject to the terms, conditions, agreements, covenants, exceptions,. and reservations expressed or provided in the several * * * contracts * * * under and by virtue of which the company * * * enjoys the use of the aforesaid properties," the properties being described as including pipe lines, compressor stations, marketing facilities, and resale contracts, all of which were pledged. As of January 2, .1930, the debtor executed and delivered to the Ashland National Bank as trustee a mortgage to secure certain sinking fund debentures and gold notes then outstanding. The junior lien was made subject to the terms and conditions of the first mortgage· and contained identical language with respect to the debtor's contracts.

On December 2, 1930, one Lockhart· was appointed receiver for the debtor on an unsecured creditors' bill. He operated the debtor's property, but used its own gas as the main source of supply, and the production from the wells of the appellants only to meet unusual market demands. The appellants continued in position to perform until December, 1933, making demands that the receiver proceed according to the contracts. In 1933, upon demand that he either perform in full or excuse the appellants from further obligation, the receiver disaffirmed the contracts. The debtor's petition for reorganization under § 77B of the Bankruptcy Act was approved October 26, 1935. Thereafter the appellants filed their intervening petitions.

The basis for the claims to priority is an asserted equitable lien. The contracts are said to be more than mere executory agreements for the purchase and sale of an ordinary commodity. They provide, in elaborate detail, it is argued, for the construction of a new and unique marketing system for gas produced by the appellants. The debtor, they urge, agreed to install a unique structure, to use it in a unique manner for their benefit, while they agreed to sell a unique commodity, namely gas reserves from large areas of developed properties, making available immediately a sufficient volume to supply the debtor's market. The gist of the bargain,

they contend, was that the debtor obtained control over a large reserve as the foundation of its resale market, while the appellants acquired the right to the use and benefit of the pipe lines, pressure stations and marketing facilities for the sale and delivery of their gas.

It being the theory of the appellants that the nature of the bargain would be clear to anyone who read the contracts and was familiar with the circumstances of the business at the time and place they were negotiated, in other words, the "local standards" by which such contracts should be construed, they incorporated in their petitions paragraphs setting forth the nature of gas leasehold rights, the character of the marketing system proposed, the unique use of such system in acceptance of deliveries of gas, and an explanation of the provisions of the contracts in the light of what they view to be the accepted standard of interpretation. These paragraphs were stricken from the petitions on the ground that the contracts were not ambiguous, and the orders eliminating them are the bases of the first two appeals.

The issues require decision whether the facts and circumstances set forth in the stricken portions of the petitions are material to a proper determination of legal and equitable rights under the contracts, and if so whether the appellants are entitled to equitable liens upon the assets of the debtor superior to the rights of bondholders. The appellants disclaim desire to show pre-existing or contemporaneous agreements dehors the contracts, but desire only to show the true meaning of the contracts by the circumstances surrounding the parties at the time they were executed. The stricken allegations, they say, relate to the subject matter of the contracts, and the contractual promises of the parties may be understood only upon reference to circumstances attending their execution, and when the subject matter dealt with is clear. So understood, the contracts gave the appellants rights in rem in the pipe lines and facilities of the debtor, recognizable and enforceable in equity. These are said to be derived from the provisions, when properly explained, that the pipe lines were to be constructed from central points conveniently located to wells, at which appellants had the right to deliver gas to be transferred to the main line; that compressor stations were to be erected to reduce intake delivery pressure to permit appellants to deliver the contract maximum of gas, and overriding them all, the specific covenant not to transport other gas in such manner as to interfere with performance according to the terms of their contracts. By every provision as to detail which foresight could make, and by the intendment of every business circumstance, they insist the so-called marketing system of the debtor was dedicated primarily to the production and sale of their gas, and was unique in the territory concerned.

Upon this hypothesis they invoke the legal principle that rights to the use and benefit of unique property, real or personal, are recognized and protected by law, and where deprivation of such use is not capable of adequate measurement in damages, equity will find and apply an appropriate remedy, and enforce it against all parties with notice of the rights invaded. Where the circumstances do not permit of a decree for specific performance, the imposition of equitable liens is the appropriate remedy to protect the appellants in their rights to restitution for deprivation of the use and benefit of the debtor's marketing facilities, since the contracts and the circumstances under which they were made evidence an intention that the debtor's pipe lines, compressor stations, and other equipment should stand as security for performance of its obligations to take and pay for the gas, and since the mortgages recognize the existence of equitable charges on its property by the provisions subjecting it to the obligations of the debtor's contracts.

Analyzing the argument thus briefly sketched, it becomes apparent that whatever may be the seemingly logical sequence of its several steps, the entire fabric is based upon the primary hypothesis that the contracts are not primarily contracts of purchase and sale, but contracts for the use, benefit and enjoyment of a unique property. If the hypothesis fails, the argument fails. But to demonstrate it, attendant circumstances, the fugacious nature of the commodity, and local standards must be shown, else the agreements will not be understood.

The difficulty with the contention, however, is that the contracts on their face, and perhaps even in the light of asserted circumstances and local standards, are contracts of purchase and sale. The commodity to be delivered, while possessing

134

attributes peculiar to it, is not unique, nor to be distinguished from the gas common to the oil fields of Kentucky and elsewhere. The terms of the contracts are those of bargain and sale and not those of use. Delivery is measured in terms of quantity and payment based on quantity rather than upon periods of use. The obligations of the sellers are fulfilled when delivery is made, and the buyer's obligations are concluded by acceptance and payment. If there be implications of use and benefit either in the contracts or in the attendant circumstances, they are but the incidents of a purchase and sale agreement. There is no suggestion that the appellants had consumer customers of their own and that the debtor's facilities were designed or required to supply them with gas, and the theory of dedication is repelled by the fact that the debtor had other sources of supply, including wells of its own.

But even were we to assume that, interpreted by attendant circumstances and local standards, the appellants have rights for the deprivation of which damages will not adequately compensate them, and that a bill for specific performance might lie against a solvent debtor, the argument still must fail. The appellants assert liens upon the property of the debtor superior to the liens of bondholders on the ground the latter had notice of their contracts. They had no notice, however, of a prior lien, or that the contracts made evident "an intention that the pipe lines, stations and other marketing facilities of Inland should stand as security for the performance by Inland of its obligations." The very terms of the stricken allegations and the argument by which their relevance is supported compels the conclusion that the contracts give no such notice. Nowhere in the agreements is there express reservation of lien on the property of the debtor. The appellants' theory of dedication to their use and benefit is to be demonstrated, they themselves say, only by showing the circumstances surrounding the parties at the time the contracts were executed, for "the nature of the marketing system provided by the contracts can only be understood by reference to the circumstances existing at the time and place where the contract relating to them was made," and, "certainly no one can understand the meaning of the promises of the parties to the contract until the subject

matter dealt with is clear." The bondholders had notice, actual or constructive, of the purchase contracts. They had no notice of local standards or facts and circumstances to put them upon inquiry as to equitable liens having priority over the bonds. "Notice of the contract which provided for no lien was not notice of a lien." North Kansas City Bridge & R. R. Co. v. Leness, 8 Cir., 82 F.2d 9, 12, 13. "The appellant has no lien. The contract neither expressly nor by implication touches that subject." Southern Express Co. v. Western North Carolina R. Co., 99 U.S. 191, 200, 25 L.Ed. 319; Des Moines, etc., R. Co. v. Wabash, etc., R. Co., 135 U.S. 576, 10 S.Ct. 753, 34 L.Ed. 243.

We note the contention that cases which involve executory contracts of public utilities have no bearing upon the present problem because in such cases considerations of public policy require the private individual interest to be sacrificed to the paramount public interest in maintaining the service important to the public. While something to that effect was said in the single reference cited, Kansas City Terminal Railway Co. v. Central Union Trust Co., 8 Cir., 294 F. 32, it was there clearly held that the contracts involved were only of the nature of personal promises and not covenants running with and binding the property, and the case was decided upon the generally applicable principle (page 38) that "as between two creditors, he who is foresighted enough to take security for his debt is preferred as against him who fails to do so." Indeed in that case, as in our case of Baker v. Central Trust Co., 6 Cir., 235 F. 17, there followed, the identical principle, though rejected, was invoked by the contract lien claimants, namely, that claims against railroads are sometimes allowed in preference to the payment of mortgage bonds because they contribute to the continued existence of a railroad as a going concern.

Finally, as we are advised by the bill of complaint filed on behalf of the debtor against the Columbia Gas & Electric Corporation, submitted in support of a motion to reverse and remand, to be hereafter discussed, the debtor's mortgages were financing mortgages in order to acquire its properties, to build its transmission lines, and for working capital. Had the liens now being claimed by the appellants been disclosed in the contracts, or

fairly discernible by reference to them, the bonds would not have been purchased. In that case there would have been no pipe line and no possibility of performance under the contracts.

The order of the District Court striking from the petitions the challenged allegations is affirmed.

## Nos. 7669, 7670.

The second group of appeals raises the questions whether under all the circumstances of the case the receiver's conduct amounted to an implied adoption of the contracts, and whether after an unreasonable delay in disaffirmance the receiver should not be required to compensate the appellants for all benefits received by him and damages suffered by the appellants during the receiver's ad interim use.

The receiver was expressly authorized and directed to operate and manage the debtor's properties in such manner as would best preserve its business as a whole, and to maintain the customary arrangements for the purchase and sale of natural gas so far as necessary to preserve the leases and contracts. The order gave the receiver six months within which to determine and elect what contracts would be affirmed or disaffirmed, and provided that user within such period should not constitute an election to adopt. During the trial period and for several years thereafter the receiver continuously took and paid for gas from the appellants, but failed to take the required minima. Six days after the expiration of the trial period an ex parte order was entered extending the trial period for another six months, and thereafter other orders were entered for similar extensions. In 1931 the receiver gave notice of his intention to disaffirm both contracts at the December, 1931, term of court. Shortly thereafter a conference was held in New York at the instance of officials of the Columbia Gas & Electric Corporation in which appellants took part and of which the chief subject was the proposed cancellation of the contracts. Their modification was suggested, but no formal agreement was reached. As a result, however, the proposed disaffirmances were not filed. Thereafter the receiver continued taking small quantities from the appellants and continued to obtain orders extending the time for disaffirmance. During all of these continued periods there was no cancellation of the contracts by either of the appellants, and the court was not asked by either of them to compel the receiver to affirm or disaffirm.

The appellants now contend that their claims for damages for breach of contract should be allowed as an expense of the receivership, to be measured by the amount they would have received for gas under the terms of the contracts, on the theory that the receiver by his delay in disaffirmance impliedly adopted the contracts, that the ex parte extension of the original trial period was of no effect in continuing it since the extension was not sought until after the expiration of the original period, and subsequent extensions were invalid since there was no notice to them of any extension. In any event the appellants claim that the estate of the debtor is liable for benefits (by reason of the oil reserve) accruing to it and damages suffered by the appellants during an unreasonable delay in disaffirmance.

A receiver is not bound by the executory contracts of the trust estate and has a right to elect whether or not he will adopt or reject them. There may be circumstances under which executory contracts may be held to have been affirmed without express declaration to that effect, and those under which it would be unfair to hold that they were not affirmed. They do not exist in this case. By the order of December 2, 1930, appointing Lockhart receiver he was not only given a period of six months within which to determine what contracts to affirm or disaffirm, but the court expressly reserved the right to extend or diminish the time so granted, and required that an election if made should be made only by an instrument in writing subscribed by the receiver and filed in the office of the clerk. The order further provided that no conduct or user of the rights by the receiver or payments by him as rent or otherwise, or any other act or omission within the period of six months unaccompanied by the filing of such written instrument should be deemed to conclude the receiver in respect of such election, or be deemed to constitute an election to adopt or to continue in force any contract, lease or agreement. It is clear that the court expressly reserved control of the election, that this was so

understood by the appellants. It is true that the first extension was not made within the first six months' period nor until six days after its termination. There is nothing, however, to indicate that the appellants were thereby prejudiced. When on November 19, 1931, the receiver notified the petitioners of his intention to disaffirm, they objected to such disaffirmance and requested the receiver to withhold its filing. The court found expressly, and the record sustains the finding, that the appellants acquiesced in the several continuances. In any event it was always open to the appellants to complain and to request the court to direct the receiver to affirm or disaffirm. This they failed to do, nor did they attempt to exercise their right of cancellation. There is no merit to the contention that if they had attempted summary cancellation of their contracts in the face of the sweeping injunction in the receivership proceedings they would have rendered themselves liable for contempt. Had they been deterred by such fear they might well have applied to the court for modification or clarification of the injunctional order, or for an order expressly permitting them to enforce their contract rights.

The alternative contention that the trust estate is liable for damages arising from non-performance of the contracts is made in reliance upon cases which hold that actual or constructive possession of property or leaseholds creates a liability in the receiver for stipulated compensation or reasonable rental value. They are not applicable. The present contracts were contracts of purchase and sale, the receiver was not in possession either actual or constructive of the property of the appellants. Failing to sell their gas to the receiver they were at liberty to sell it elsewhere. Indeed the record discloses a tentative arrangement made with another pipe line company. Whatever may have been the reason for conditioning the proposed agreement upon disaffirmance by the receiver it demonstrates control by the appellants of their reserves and a market for them. There was no error in the order below denying the claims of the appellants as administration expenses of the receivership.

### On Motion to Reverse and Remand.

We are advised that since the taking of the present appeals the debtor's trustee has begun suit in the United States District Court for the District of Delaware against the Columbia Gas & Electric Corporation for alleged violations of the Anti-Trust Law in respect to the acquisition and ownership by Columbia of bonds and other securities of the debtor, in which triple damages are sought, and that suit has also been instituted by the United States against Columbia for anti-trust law violations. These suits are now advanced as in the nature of newly discovered evidence, and it is urged that averments therein, if established, will render the entire receivership fraudulent ab initio, and the receiver's disaffirmance of contracts of no effect. We are therefore requested to reverse and remand the cause to the court below there to await disposition of the anti-trust suits and a determination of their materiality and bearing upon present issues.

But the questions here involved are questions of priority. The validity of claims of the appellants as general claims have not been adjudicated below but have been expressly reserved. By the court's order of December 3, 1938, a substantial distribution to first mortgage bondholders other than Columbia has been directed, though distribution has been delayed until the termination of these appeals. The amounts payable to Columbia as a bondholder are impounded and withheld. Since approximately 65% of the first mortgage bonds are in the hands of the public, affirmance of the assailed orders will permit distribution to go forward. Whatever the result of the anti-trust suits it will not affect the rights of such bondholders as against appellants as general creditors, and if there is any recovery by the trustee against Columbia it will inure to their benefit if sufficiently substantial. The motion to remand is overruled.

The orders below are affirmed.