COLUMBIA GAS & ELECTRIC CORPORATION v. UNITED STATES et al.
(three cases).

Nos. 9775–9777.

Circuit Court of Appeals, Sixth Circuit.
Oct. 9, 1945.

As Amended on Petition for Rehearing
Nov. 26, 1945.

Petition for Rehearing and Modification
Denied Jan. 21, 1946.

See 153 F.2d 101.

Floyd C. Williams, of Cincinnati, Ohio, and William D. Whitney, of New York City (Floyd C. Williams, Frank W. Cottle, Peck, Shaffer & Williams, and Ernst, Cassatt & Cottle, all of Cincinnati, Ohio, and Cravath, Swaine & Moore, of New York City, on the brief), for appellant.

Paul Williams, of Washington, D. C., Arthur G. Logan, of Wilmington, Del., and Roger S. Foster, of Philadelphia, Pa., for appellees.

Arthur G. Logan, of Wilmington, Del., Robert J. Bulkley, of Cleveland, Ohio, Richard B. Hand, of New York City, and W. E. Darragh, of Lexington, Ky., on the brief, for Russell Van Horn et al., as Committee for Bondholders of Inland Gas Corporation.

Baker, Obermeier, Rosner & Rosenson and Oscar S. Rosner, all of New York City, on the brief, for appellees Green Committee and Morris Green.

Roger S. Foster, Theodore L. Thau, and David Ferber, all of Philadelphia, Pa., and Charles J. Odenweller, Jr., of Cleveland, Ohio, on the brief, for Securities and Exchange Commission.

Wendell Berge and Paul Williams, both of Washington, D. C., and Claude P. Stephens, of Lexington, Ky., on the brief, for the United States.

Before HICKS, SIMONS, and MARTIN, Circuit Judges.

SIMONS, Circuit Judge. Upon a more complete record and with new and differently aligned parties, we meet again in these appeals the basic problem encountered in In re American Fuel & Power Co., 6 Cir., 122 F.2d 223. That case involved appeals by creditors of Kentucky gas corporations in Chapter X, 11 U.S. C.A. § 501 et seq., bankruptcy reorganization proceedings from orders authorizing and directing trustees to consummate a proposed settlement of cross-demands between the debtors and the Columbia Gas & Electric Corporation, the present appellant. The orders were attacked on the ground that the stock interests and securities of the debtors had been acquired by Columbia from the public for purposes condemned

by and in violation of § 7 of the Clayton Act, 15 U.S.C.A. § 18. The Securities and Exchange Commission had been a party to the proceedings and supported the appeal.

Columbia was not a party to the cause previously reviewed, the controversy being between the debtors' trustees who had recommended the settlement, and certain creditors' committees which had opposed it. The facts out of which the controversy arose were not there in dispute, and assuming them to present a controlling factual basis for decision, though not binding upon Columbia since it was not a party, this court concluded that the principles of law discussed in its opinion required a mandate to the district court to fix the division of creditors and stockholders of the debtors into classes according to the nature of their respective claims and stock, that all claims or stock interests of Columbia in the debtors' titles be rejected and Columbia take nothing thereby.

Upon remand, issues were fully framed between Columbia as a creditor and stockholder of the debtors, and the debtors' trustees, and an exhaustive hearing was had, preserved for us by a 6 volume record, wherein, upon detailed findings of fact and conclusions of law, the judgment here sought to be reviewed was entered, directing that all claims of Columbia against the debtors filed in Chapter X proceedings before the district court and any stock interest of Columbia in the debtors, be rejected.

The present case is new with added litigants and parties differently aligned. The creditors' committees had filed their several petitions seeking rejection of Columbia claims, the United States intervened on the ground of a public interest involved which might be adversely affected by a ruling of the court if inconsistent with relief sought in an anti-trust proceeding pending in the District Court of Delaware, and has assumed the burden of supporting the decree which S. E. C. also supports, and Columbia has had its day in court. We are not obliged to consider whether, upon the facts there assumed, the American Fuel and Power case was rightly decided, or its mandate broader than the issues required. Columbia was not bound by it, the present record is complete, and the principle of "the law of the case" does not govern our decision. The appellant's inference that the district judge was, by our earlier decision, led to an erroneous evaluation of evidence, finds little support in his carefully detailed findings, however bound he may have felt to apply principles of law, by us thought to be controlling.

In the main, his findings are not controverted insofar as they disclose the origin and purpose of the debtors and the story of Columbia's interest in their activities which follows. Inland Gas Corporation was incorporated in 1927, and Kentucky Fuel Gas Corporation in 1928, both for the purpose of producing, transporting and selling natural gas to industrial consumers. They were promoted by the same persons and financed by the same group of bankers, and each issued securities to the public and distributed its common stock to the promoters and underwriters as compensation for services. The promoters also, in July, 1928, organized the American Fuel & Power Company for the purpose of taking over and holding stock of Inland and Kentucky Fuel and other operating companies which might later be organized, in order to integrate and expand their operations through unified control and management. Stockholders of Inland and Kentucky Fuel exchanged their stock for stock in the holding company, and in July, 1929, American Fuel issued and sold to the public an issue of convertible gold notes, maturing July 1, 1934. The proceeds thereof were used to provide financial aid to the operating companies, and to acquire additional gas acreage and transmission lines. American Fuel also organized and financed other subsidiary companies for the purpose of having them acquire, hold and operate various properties.

During the same period Columbia, through numerous subsidiary corporations, was engaged in the production, transmission and sale of natural gas to both industrial and domestic consumers in Kentucky, West Virginia, Ohio, Indiana and other states. Such subsidiaries were connected by interstate transmission lines and integrated, through unified management and operation, into what is known as the "Columbia System." The Columbia subsidiaries served both domestic and industrial consumers and so were public utilities subject to the rules and regulations of State Public Utility Commissions and the provisions of municipal franchises under which they operated. The result was that they could not contract with industries at fixed rates for definite periods because of the power of state

and municipal authorities to change their rates and to require them to give preference to domestic consumers when gas was insufficient for both. The subsidiaries of American Fuel served only industrial users under private agreements, and all plans for expansion of the American Fuel system contemplated strict adherence to that policy. Being free from constraint by municipal franchises and state regulation, they had a substantial competitive advantage over Columbia wherever they came into competition with it.

Prior to the organization of American Fuel, Columbia was practically free from actual competition in the field occupied by its subsidiaries in Kentucky, Ohio and West Virginia, but during 1928, 1929 and a greater part of 1930, the operating subsidiaries of American Fuel, as a result of their competitive advantage, took from them some of their large industrial customers, including the American Rolling Mill Company. During 1929 and 1930, Columbia was engaged in developing a plan for the construction of a natural gas pipe line from its Kentucky and West Virginia fields to the eastern seaboard cities of Washington, Baltimore and Philadelphia. As originally planned, the project called for a large increase of gas reserves in West Virginia and eastern Kentucky, and to acquire such reserve Columbia embarked upon a large scale program for increasing its acreage. The gas acreage held by American Fuel was considered by it to be desirable. Inland and Kentucky Fuel had sustained substantial operating losses in 1928 and 1929, due to their heavy burden of securities and burdensome gas contracts, and so were never able to earn their fixed charges. Columbia knew of this precarious financial condition and that the indentures securing the bonds of Inland and Kentucky Fuel provided that upon their failure to meet interest or sinking fund requirements the indenture trustees could institute foreclosure proceedings upon the request of holders of 25% of their bonds. Anticipating such eventuality, and to place itself in a position to force foreclosure and sale of the properties with an opportunity to purchase them at foreclosure, Columbia, in January, 1930, began to purchase Inland and Kentucky Fuel bonds on the open market by methods which concealed the fact that it was the purchaser, and by the end of April, 1930, had acquired in excess of 25% in principal amount of the bonds of both.

From the beginning of their operations, Inland and Kentucky Fuel were under the supervision and management of Hope Engineering Company, an organization with wide experience in successfully promoting and building gas transmission lines. It recognized the dubious financial condition of American Fuel and its subsidiaries, and realized that its only hope of survival was to secure capital not only to bridge its immediate difficulties, but to finance a large expansion of its business. The industrial area in and around Detroit, Michigan, not then supplied with natural gas, was conceived to be an inviting field, and Hope recommended that American Fuel make an effort to enter it. Plans for that purpose were formulated, and Hope succeeded in inducing American Utilities & General Corporation and Moody-Seagraves Company to join in the promotion. These companies united their resources and combined their efforts as a syndicate to construct a natural gas transmission line from Eastern Kentucky to Detroit which would pass through the heart of the territory then occupied and served by the subsidiaries of Columbia. American Utilities and General Corporation was a prosperous and successful investment trust, backed and controlled by G. E. Barrett & Company, a strong banking corporation which had financed many gas enterprises. Moody-Seagraves Company had successfully built and operated natural gas projects and had wide experience in their promotion. The Syndicate was considered to be a combination of sufficient financial strength and business experience to foreshadow success of the Detroit project and so prevent the impending financial collapse of the American Fuel System.

The Syndicate acquired voting trust certificates, notes, and a majority of the common stock of American Fuel, which gave it complete control of that System. To prevent default in maturing obligations of American Fuel, Inland and Kentucky Fuel, Hope agreed to provide funds sufficient to meet their immediate sinking fund requirements. Operations of the Syndicate were carried on by and through corporations which it wholly owned and controlled. Through one it applied for a franchise to lay gas pipe lines in the streets of Detroit, and entered upon a vigorous campaign to secure contracts from industrial consumers

there as well as in the territory through which the proposed line would be constructed; through another it surveyed and acquired the right-of-way for the transmission line from the gas fields of Eastern Kentucky, including necessary permits for river crossings; and through still another it started acquiring additional gas acreage in Eastern Kentucky. The plan was for the Syndicate to provide sufficient money to advance the project to a point where its successful completion and profitable operation could be demonstrated, and then to sell bonds to the public in amount sufficient to finance completion. Contracts were obtained from industrial consumers in the Detroit area and elsewhere, and Ralph K. Davis, a nationally known and reputable gas engineer, was employed to investigate and analyze the proposed enterprise. After an exhaustive survey he reported the gas reserve to be sufficient, the industrial market adequate, and the project, as a whole, a sound business proposition which would be profitable to the gas company and of economic advantage to the industries of Toledo and Detroit.

During this time Columbia was also making plans to supply natural gas to the Detroit area. It made a survey of the market in Detroit, and while the application of the Syndicate for a franchise was pending, Columbia's executive committee passed a resolution providing for an extension of its existing gas transmission lines from Toledo to Detroit. The success of these plans was threatened not only by the plans of the Syndicate for the development of the American Fuel System, but also by the starting of a large pipe line for the transmission of natural gas from the Texas Panhandle and the Hugoton gas fields of Kansas, which was proposed to be extended into Ohio, Michigan and Indiana and make gas available to cities then supplied by Columbia, and also to Detroit toward which Columbia was planning. In addition, the United Carbon Company, with acreage in Eastern Kentucky, had announced an intention to build a natural gas pipe line to Cincinnati for the purpose of supplying gas to that city in competition with Columbia, and proposed to furnish natural gas to a number of Columbia customers in the Cincinnati area at a substantially reduced rate. United Carbon Company's threat was averted through the purchase of all of its gas by Warfield Natural Gas Company, a Columbia subsidiary.

Competition from the Texas and Hugoton fields was avoided through purchase of complete control of that project by Columbia Oil and Gasoline Corporation, another Columbia subsidiary, entailing an investment of more than $30,000,000. Meanwhile, Columbia continued to acquire bonds and debentures of the American Fuel System until it had acquired approximately 42% of Kentucky Fuel obligations and approximately 36% of the obligations of Inland, representing an aggregate expenditure of between three and four million dollars.

On October 30, 1930, Columbia purchased the Syndicate's entire holdings in the American Fuel System, and all other corporations which had been organized by the Syndicate for the promotion and development of the Detroit project. This purchase included 76% of the outstanding common stock of American Fuel, together with all claims and securities held by the members of the Syndicate in American Fuel and its subsidiaries. The price paid by Columbia returned to the Syndicate members all that they had invested, and gave them a clear profit of $350,000. In addition, Columbia guaranteed to employ Hope to perform natural gas engineering work on at least $20,000,000 of construction projects within a period of three years, for which it agreed to pay Hope a compensation of 4%,—an obligation which it later discharged by paying Hope $400,000 without any work being done by Hope. The Syndicate delivered resignations of all officers and directors of American Fuel, its subsidiaries and other associated corporations, and they were replaced by persons designated by Columbia. Nominees of Columbia were made voting trustees of a majority of the capital stock of Kentucky Fuel. Columbia agreed to hold the members of the Syndicate harmless by reason of the obligation of Hope to provide funds to meet sinking fund requirements of Inland and Kentucky Fuel, and in respect to any obligation imposed by gas contracts entered into with industrial consumers, and from certain obligations under leases of gas acreage.

By the use of certain of its claims Columbia promptly initiated receivership proceedings against Inland and Kentucky Fuel, and its nominee, Lockhart, was appointed receiver. There were no further efforts to advance the Detroit project. The negotiations pursuant to which Co-

lumbia had acquired from the Syndicate control of the American Fuel System, were inaugurated by C. R. Seagraves, President of the Moody-Seagraves Company, as his confidence in the ability of the Syndicate to successfully complete the Detroit project had been considerably shaken by reason of the financial depression and the depleted financial strength of the members of the Syndicate.

Up to this point there is little, if any, controversy as to the facts thus narrated. The court, however, found that while Seagraves had lost confidence in the success of the Detroit project, other members of the Syndicate did not share his views and were probably induced to agree to the deal with Columbia by the large profits realized from it, and that a collateral inducement to Seagraves was the prospect of his making a profitable contract with Columbia to take gas from fields in the Southwest in which he was interested. It also found that though the Syndicate was encountering obstacles in the promotion of the Detroit project, it had not abandoned it and it constituted a sufficient menace and threat to Columbia to induce Columbia to make the deal highly profitable to the Syndicate members, and that but for the consummation of this transaction the Syndicate was ready, able and willing to continue its efforts. Whether it would have ultimately succeeded is a matter which lies entirely in the realm of speculation. It further found that prior to Columbia's acquisition of domination and control of the American Fuel System, it had asserted, through certain of its responsible executive officers, that it would not lie idly by and permit the construction of a pipe line through the heart of its territory as proposed by the Syndicate, and that on and prior to January 1, 1930, and continuing throughout 1930 and thereafter, Columbia, its executive officers, directors and certain of its corporate subsidiaries, were engaged in a conspiracy, the object, purpose and effect of which was to restrain and monopolize trade and commerce in natural gas in and between the states of Kentucky, Ohio, West Virginia, Indiana and Michigan, that the claims presented by and on behalf of Columbia against the debtors, American Fuel, Inland and Kentucky Fuel, were acquired pursuant to and in accomplishment of the aims and purposes of that conspiracy, and that any plans on the part of Columbia to utilize the properties of the American Fuel System,

were merely collateral and incidental to the main purpose of the conspiracy which was to restrain actual and potential interstate competition in the production, transportation, distribution and sale of natural gas. Wherefore, in applying the principles of law announced by this court in the American Fuel and Power case, supra, it concluded it to be the duty of the Bankruptcy Court to withhold its aid from parties seeking benefit from an agreement tinged with illegality, and that under the facts of record it was not required to approve the claims or stock interests of Columbia.

The appellant challenges the finding that it acquired the stock of American Fuel pursuant to a conspiracy to restrain and monopolize trade; it denies that the Syndicate was ready and able to build the proposed line to Detroit; contends that if the Syndicate had continued its efforts to develop the project its success was not only in the realm of speculation but had become impossible; that prior to its purchase contract with the Syndicate, the plans for the Detroit project had been abandoned, and in any event they did not constitute a sufficient menace and threat to Columbia to induce it to make the purchase of American Fuel stock from the Syndicate profitable to its members. It further contends that in 1930 receiverships for Inland and Kentucky Fuel were inevitable, that there was no substantial competition in interstate commerce between the two systems, and if there were it was incapable of affecting prices, and finally that Columbia's acquisition of American Fuel securities did not adversely affect or damage the interests of the debtors or their security holders. If the assailed findings are found to be erroneous it asserts that the judgment must be reversed. Alternatively, it asserts that if such findings are sustained reversal still must follow on the ground that the district court was without power to forfeit claims upon securities acquired in violation of the Anti-Trust Laws because the Anti-Trust Laws provide their own penalties to which the court may not add; that Columbia's claims may not be rejected without a showing and finding thereon that the interests of the debtors or their security holders were adversely affected or damaged by the Columbia purchase; and that such purchase was permissible under the express provisions of § 7 of the Clayton Act. Its last stand is that the purchase of Inland and Kentucky Fuel bonds prior to October 30, 1930, was legal even though

it should be held that its stock purchase was prohibited by the Clayton Act.

■ It is difficult in the brief compass of an opinion, and we find it unnecessary, to consider each issue of fact and law categorically, as departmentalized in the briefs. The appellant finally, after extended argumentation, concedes that equity will not affirmatively aid in the doing of a wrong. So it will not, for instance, enforce a patent, when utilized to further a scheme to restrain or monopolize trade, as in Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 788, 62 S.Ct. 402, 86 L.Ed. 363; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367; Hartford-Empire Co. v. United States, 323 U.S. 386, 65 S.Ct. 373, and it will not recognize a claim which is being asserted as part of a scheme by a dominating stockholder to defeat the lawful prior claims of creditors. Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281; Taylor v. Standard Gas & Elec. Co., 306 U.S. 307, 618, 59 S.Ct. 543, 83 L.Ed. 669. It asserts, however, that the mere fact that property has been acquired in connection with some statutory or other wrong, does not deprive the owner of his property interest where he is not asserting that property interest in furtherance of the wrong, but is only asking for a recovery of its money value. The public interest may then be protected by an appropriate injunction, as by enjoining Columbia from voting or otherwise exercising control. It asserts that the wrong, if any, which has been the subject matter of this litigation throughout, has been a wrong alleged to have been done to the public through the Anti-Trust Laws, and the case therefore has no relation at all to cases of the type of Pepper v. Litton, supra, and Taylor v. Standard Gas & Elec. Co., supra, in both of which the wrong complained of was that done by a majority stockholder to the creditors.

■ We may readily agree with the distinction thus asserted without necessarily accepting its application to the case at bar. A court of equity, however compelled by the traditional doctrine that one who seeks equity must not himself be guilty of inequity, is neither obliged nor capable of policing the enforcement of all state and federal laws. The maxim does not apply to every unconscientious act or inequitable conduct of the plaintiff, or to misconduct which is unconnected with the matter in litigation, Bentley v. Tibbals, 2 Cir., 223 F. 247, and equity is not "an avenger of wrongs committed at large by those who resort to it for relief." Kinner v. Lake Shore, etc., R. Co., 69 Ohio St. 339, 344, 69 N.E. 614, 615; 1 Pomeroy's Eq.Jur. § 399. So if the evidence here of a conspiracy to restrain or monopolize trade in interstate commerce were limited to evidence that Columbia had stifled competition in its territory and sought to maintain monopoly therein by its purchase through subsidiaries of the United Carbon Company's gas and control of the transmission line from the Texas Panhandle and Hugoton gas fields of Kansas, even though such evidence established that it thus was engaged in a conspiracy to restrain and monopolize in violation of the Anti-Trust Laws, such evidence would not confer upon a court of equity jurisdiction to deny complete enforcement of its property rights in the stock and securities of American Fuel and its subsidiaries, however it might furnish the basis for a direct proceeding such as is now pending at the complaint of the government in the Court of Delaware.

■ To sustain the judgment below the appellees must have proved not only inequitable or illegal conduct, but that the debtors, their stockholders or public creditors were injured thereby. Glenn Coal Co. v. Dickinson Fuel Co., 4 Cir., 72 F.2d 885, 887; Bentley v. Tibbals, supra; American Steel & Wire Co. v. Wire Drawers' et al., 6 Cir., 90 F. 608; Louisiana Farmers' Protective Union v. Great Atlantic & Pacific Tea Co., D.C., 40 F.Supp. 897. This they undertook to do by proof that the success of the American Fuel System depended upon an expansion of its market sought to be achieved by the Detroit project, that the completion of this project was vital in preserving the interests of creditors and stockholders in the constituent corporations, and that they were prevented from completing it by the activities of Columbia in furtherance of an integrated scheme to destroy the American Fuel System, first by buying up a sufficient number of bonds to compel the foreclosure and sale of its properties, then by stock purchases which gave Columbia control so as to put an end to the Detroit project, and finally the use of its claims to force the companies into receivership with a Columbia nominee as receiver. To this Columbia makes answer that the American Fuel Company and its subsidiaries were so unsoundly financed that receivership was inevitable, that the Detroit project could never have been brought to successful

fruition, that it had been completely and irrevocably abandoned, and that Columbia's sole purpose in buying into American Fuel was to acquire additional gas reserves for its Seaboard pipe line.

In our view it is entirely immaterial that American Fuel, Inland and Kentucky Fuel, were not themselves to build the pipe line from Kentucky to Detroit, and that the projected line was to be constructed, owned and operated by the Syndicate through certain corporations not subsidiary to American Fuel but controlled by the members of the Syndicate. The primary purpose of the project was to furnish an outlet for the gas reserves of the American Fuel System by making them available in a larger market; no other purpose is suggested and no other source of supply is indicated to serve the proposed transmission line. The Detroit line would have served American Fuel and its subsidiaries, and in its successful completion lay their only hope for escape from impending financial disaster. Were this not so there would seem to be little point to the effort made by Columbia in record, argument and brief, to demonstrate the impossibility of its construction, the abandonment of the project, and that in it there was no menace or threat to Columbia.

In the contention that Columbia's acquisition of American Fuel Securities did not adversely affect or damage the interests of the debtors and their security holders, Columbia analyzes the several steps in its activity for the purpose of demonstrating that its purchase of American Fuel Securities, its subsequent purchase of a controlling stock interest, and its later placing of American Fuel and its subsidiaries into receivership, was each a permissible undertaking, first for investment authorized by law, and then the utilization of legal means to protect such investment. By this rationalization it seeks to escape the charge that the overall purpose of its entire activity was a scheme to achieve control of American Fuel or to bring about its demise to the end that it be destroyed as a competitor in a field in which Columbia was exercising virtual monopoly. This was the theory underlying the petitions of the debtors, our earlier decision and the judgment below, which must now be examined in the light of the record here presented.

There is substantial credible evidence that from the very beginnings of the promotion that led first to the incorporation of Inland, then to the organization of the American Fuel System, and later to the organization of the Syndicate which proposed to construct the Detroit pipe line, Columbia was fully conscious of the threat to its subsidiaries that these organizations would present with the competitive advantage afforded by their immunity from state and municipal regulation. It manifested early and continued hostility to the venture, and exerted every possible influence to thwart its successful fruition. It early lodged a complaint with the Better Business Bureau of New York in respect to the financing of Inland; it manifested great concern over the taking from its subsidiaries important industrial customers in their territory; it kept itself completely informed as to the financial and operating activities of American Fuel and its subsidiaries and the provisions of their contracts for gas. Though fully informed of the unsoundness of their financial structure and their improvident gas contracts, it began in January of 1930 secretly to purchase bonds and securities of Inland and Kentucky Fuel at but little discount from their par values. Its president declared that "if anyone thinks Columbia will allow a ditch to be dug across the State of Ohio, he is just crazy," and that if Columbia came into the picture it would have to "put the company [American Fuel] through the wringer." Finally, though now proclaiming that American Fuel and its subsidiaries were unsoundly financed, that neither it nor its subsidiaries could meet their fixed charges and sinking fund requirements and were headed for receivership, it paid approximately $3,000,000 for stock control and assumed heavy obligations subsequently liquidated by substantial payments. It is true that much of this evidence was controverted, but we are not able to say that the district judge, who had advantages superior to ours for determining the truth, was clearly wrong in the determinations, expressed and implicit in his findings, especially when viewed against a background of evidence pointing clearly to restraint of competition from sources other than Kentucky gas fields.

Much is made by Columbia of the finding below that whether the Detroit project would have ultimately succeeded, is a matter which lies entirely in the realm of speculation. Promotions, such as are here disclosed, have always in them a speculative element. That the Detroit project was not unsound is evidenced by the Davis report heretofore referred to, by the substantial

investment therein by the experienced members of the Syndicate, and by the evidence which, with much persuasiveness, indicates Columbia's concern in regard to the threatened competition.

The finding that the Detroit project was not abandoned until Columbia took over control of American Fuel through its stock purchases, is justified by the evidence. No announcement of abandonment had ever been made, and while the members of the Syndicate had suffered in their financial ability to carry it through, by reason of the depression, it is not demonstrated that all expedients for financial support had yet been fully explored. The Syndicate members were both strong and experienced and would not have surrendered without exhausting all possible means to achieve success. The most that is said in the record by some of the members of the Syndicate, is that in their minds they had concluded that the project could not be carried through, and so that it was abandoned. But this evidence must be and was viewed in the light of the fact that the Syndicate members had, through Columbia, recovered their investment and taken their profit, and so loses its persuasiveness.

The prospect of recovery and possible profit in what may now seem to have been initially an improvident investment by security holders, lay in the achievement by American Fuel and its subsidiaries of an expanded market to be opened up by the Detroit pipe line. The realization of their hopes was forever destroyed by the activities of Columbia in assuming control of the American Fuel System, terminating further pursuit of the Detroit plan and placing the companies in receivership. It was neither for the court below, nor is it for us to indulge in retrospective prophecy. The Detroit project may have failed of accomplishment even if Columbia had kept its hands off, but as pointed out in Taylor v. Standard Gas Co. supra, [306 U.S. 307, 59 S.Ct. 550], (The Deep Rock case), "it is impossible to recast Deep Rock's history and experience so as even to approximate what would be its financial condition at this date had it been adequately capitalized and independently managed and had its fiscal affairs been conducted with an eye single to its own interests." The hope that the debtors, their public creditors and the Syndicate may have had in the success of the Detroit project, was one they had a right to entertain. If realized, American Fuel would not have been the first company saved from disaster by improved management and access to an expanded market. It is idle, therefore, to contend that the elimination of that prospect was not an injury to them, however impossible it may now be to measure their damage. Granted that, as unrelated and independent acts, the purchase of American Fuel securities by Columbia or the purchase of stock control therein did not adversely affect the interests of the debtors and their creditors, yet the exercise of the power which such purchase and control gave to Columbia in the manner and for the purpose in which it was exercised, clearly affected such interests adversely.

■ Columbia's contention that its sole purpose in buying into American Fuel was to secure the Kentucky gas reserves which American Fuel controlled and which Columbia needed for its proposed Seaboard pipe line, does not square with the substantial price paid for American Fuel stock and securities and the heavy obligations otherwise assumed, or with Columbia threats to prevent the building of a pipe line and to put American Fuel through the wringer. It does not square with the subsequent abandonment of great areas of gas acreage, even with allowances for the curtailment of Columbia's activities necessitated by continuance of the depression. The court was justified in its finding that Columbia's main purpose was to restrain actual and potential interstate competition in the production, transportation, distribution and sale of natural gas, notwithstanding a collateral and incidental purpose to acquire and utilize the properties of American Fuel.

■ The argument that the court, for alleged violations of the Anti-Trust Laws, imposed in a bankruptcy proceedings penalties other than those specified in the Anti-Trust Statutes, must be rejected. The court imposed no penalties; it but exercised its equity power to deny relief to a creditor seeking enforcement of contracts entered into illegally or tainted with inequity. To apply the doctrine so vigorously urged by Columbia, is to deny the power and duty of equity, to reject demands arising out of illegal or inequitable conduct whenever such conduct is subject to legal penalties imposed by state or federal law, and so to limit it to that narrowly restricted field in which the chancellor may sense inequity even in the absence of statutory condemnation. A denial of this contention does not mean, of

course, that the power may be invoked in respect to conduct constituting no wrong to the parties or interests in litigation.

In our view, Columbia receives no support from the case of Hartford-Empire Co. v. United States, 323 U.S. 386, 65 S.Ct. 373, wherein it was held that the use of patent positions to allocate fields of manufacture and to maintain prices, violated the Anti-Trust Laws and could be restrained, but that the court was without power to compel action, which amounts to a forfeiture of patents. Columbia correctly points out that there is no distinction between a patent and a bond; both are a species of property and neither can be confiscated because of past uses. But its contention in other respects ignores the fundamental basis of the Hartford-Empire decision which, in line with Morton Salt v. Suppiger and B. B. Chemical Co. v. Ellis, supra, denies enforcement of patent rights against infringers, so long as the patent owner is using his patent in violation of the Anti-Trust Laws. It may well be, under the facts of the Hartford-Empire case, that there remained to the appellants there, property rights which, when their owners had abandoned their illegal use and been purged of inequity, could still be enforced against subsequent infringers. Such rights the court would not allow to be confiscated. This doctrine has no application to the present status of Columbia, at least in respect to the subordination of its claims by the decree. In that respect the decree merely denies enforcement of the Columbia claims precisely as the Hartford-Empire decision denies enforcement of patents illegally used against those infringing during such illegal use. The fruits of Columbia's inequitable activities are still retained in its freedom from competition by American Fuel, and Columbia's suggested remedy would still leave wronged stockholders and creditors without relief, for a restoration of the status quo ante is manifestly now impossible. It may be as suggested by the S. E. C. that, under the facts of the case, the distinction between subordination and rejection is purely academic, but submissiveness in principle to the doctrine of the Hartford-Empire case, perhaps requires an amendment to the decree, limiting the remedy of the petitioners to the subordination of the Columbia claims.

Lastly is Columbia's contention that there is no basis for subordination of bonds purchased prior to the date when it acquired stock control of American Fuel, that this was an isolated transaction unrelated to subsequent inequitable conduct. The bond purchase was, however, upon the facts found, supported by credible and persuasive evidence, but the initial step in an integrated policy to preserve Columbia's monopolistic position in the territory here involved, and to prevent and stifle actual or threatened competition by American Fuel. Such bonds have therefore no status superior to the stock or bonds later acquired. In re Kansas City Journal-Post Co., 8 Cir., 144 F.2d 791.

We have examined the issues of law and fact presented by the appeal, not herein specifically discussed. We find them to be without merit.

The decree will be limited in remedy to the subordination of the Columbia claims to the claims of all other creditors of every class, and as so amended, the judgment is

Affirmed.