**In re INLAND GAS CORP. et al.**

**No. 11828.**

United States Court of Appeals
Sixth Circuit.

Dec. 4, 1953.

Carlos L. Israels, New York City (Berlack, Israels & Liberman, New York City, Middleton, Seelbach, Wolford, Willis & Cochran, Louisville, Ky., on the brief; Leo T. Wolford, Louisville, Ky., David Grossberg, Brooklyn, N. Y., of counsel), for appellant.

Oscar S. Rosner, New York, N. Y., Charles J. Odenweller, Jr., Cleveland, Ohio, for appellees.

Oscar S. Rosner, of counsel; Baker, Obermeier & Rosner, New York City, on the brief, for Green Committee.

Roger S. Foster, Gen. Counsel, David Ferber, Sp. Counsel, Aaron Levy, Atty., Washington, D. C., Charles J. Odenweller, Jr., Cleveland, Ohio, on the brief, for Securities and Exchange Commission.

Selden S. McNeer, Huntington, W. Va., on the brief, for Ben Williamson, Jr., trustee.

Before SIMONS, Chief Judge, MARTIN and MILLER, Circuit Judges.

SIMONS, Chief Judge.

This much litigated reorganization proceeding has been before this court frequently since 1939, Hamilton Gas Company v. Inland Gas Corporation, 6 Cir., 102 F.2d 131; In re American Fuel & Power Company, 6 Cir., 122 F.2d 223, Columbia Gas & Electric Corporation v.

United States, 6 Cir., 151 F.2d 461; In re Inland Gas Corporation, 6 Cir., 187 F.2d 813, and much applicable history is there revealed. The Bankruptcy Court, by orders dated February 12, 1953, has now approved a joint plan of reorganization for all three companies. The appellant filed a petition in the proceeding which, if granted, would increase the participation of Kentucky's creditors in the assets of Inland beyond the amounts allocated to them, require revision of the plan, and again postpone closing the proceedings. Four other appeals are also pending. We are not presently advised of their nature, though it is suggested that decision here may render their issues moot.

Appellant Kern though not an original bondholder of Kentucky Fuel asserts a claim on behalf of Kentucky against Inland, which companies are both subsidiaries of American Fuel. Kern's claim is based upon the purchase by Kentucky of certain gas-producing property from the American Rolling Mill Company in 1928 and he alleges unfairness to Kentucky in an intercompany contract between Kentucky and Inland. He avers that though Kentucky paid Armco for the property, the purchase was for the benefit of Inland and, so, Kentucky should be recognized as having an enforceable claim against it for the capital loss arising out of the investment. As ancillary to the proceedings, he seeks appointment of an independent trustee for Kentucky and, failing that, for appointment of independent counsel for it.

Uncontroverted facts follow. On December 15, 1927, Inland acquired the rights of the seller to a contract with Armco by which Armco agreed to buy its entire requirements of natural gas for its works in Ashland, Kentucky, over and above the gas which it should produce from its own acreage and which it might purchase from producers on neighboring property. The contract was to last for fifteen years. On June 8, 1928, Kentucky bought the natural gas properties of Armco for $3,000,000. It financed its purchase by a $4,000,000 bond issue, and Kern's bonds are part of this issue. It also secured from Armco a contract for supplying it with its entire requirement of natural gas over and above what was being supplied to it by Inland under the latter's contract for a period of fifteen years. Inland and Kentucky agreed that, under their respective supply contracts with Armco, Inland would supply the first 6,000,000 cubic feet per day of the gas requirements of Armco while Kentucky would suppy the remainder. While Inland and Kentucky had at that time no interlocking directors and Inland was not a stockholder of Kentucky both companies were under common control. Armco's gas reserves had been estimated by a recognized firm of engineers and geologists to be 212,000,-000,000 cubic feet and a contemporaneous appraisal of the properties put their value at $6,251,055. Armco had plans for expansion of its plant facilities which if carried out would raise its natural gas requirements to 17,000,000 cubic feet per day. The directors of Inland and Kentucky approved the Armco purchase and the intercompany agreement at separate meetings. On November 6, 1930, Columbia acquired control of both companies and precipitated receiverships which gave way to the bankruptcy proceedings. This resulted in discontinuance of an effort to promote a Detroit project which was expected to provide a market for all of the gas reserves of both companies and the rest of the American Fuel System. During the pendency of the reorganization proceedings the major portion of Kentucky's Fuel leases were surrendered, its wells abandoned, and, on December 10, 1938, the remaining properties of Kentucky were sold under court order at public sale to the Inland Estate for the sum of $151,192.

Kern, a lawyer, began buying Kentucky securities on May 5, 1941. It became apparent from our decision in In re American Fuel & Power Company, supra, on August 15, 1941, that the large claims of Columbia would either be subordinated to the claims of other creditors or be entirely rejected. Our subsequent.

decisions gave finality to this foreshadowing and also pointed to the highly successful operations of the single trustee. Kern continued his purchase of Kentucky securities through the years until by his last purchase on January 10, 1952 he had acquired $303,300 face value of the bonds. He had attended and been heard at various hearings since the early part of 1948. Though the court had directed that all claims be presented at the hearings in 1948 and 1949, he filed no claim on behalf of Kentucky until his petition in this case, on April 25, 1952. It was opposed in the court below by the Green Committee representing security holders of American Fuel who will be adversely affected if Kern prevails. The Securities & Exchange Commission recommended the plan heretofore approved by the court, and its brief here supports the challenged orders.

Kern bases his claims on behalf of Kentucky principally upon the unfairness of the intercompany contract by which Inland was given a priority on its Armco contract for the first 6,000,000 cu. ft. of gas per day and relies upon excerpts from evidence given by several promoters many years before but long after the events of 1928, and upon other issues. The question, he says, is one of motivation with the best judge of motivation the man who engineered the deal. That man was Alfred Howell, a director and stockholder of Inland, later a stockholder of Kentucky, and one of the principal stockholders of Hope Engineering & Supply Company, the management company which put together the American Fuel System. Howell deposed that Inland at the time had more gas than it could use and because of the reservation in the Armco contract he was not looking for more gas. He didn't want the American Rolling Mills' acreage. Nevertheless, he took an option on the Armco property for $3,000,000, contributing one-third of the $100,000 down payment out of his own pocket—"It was just a question of if I didn't buy it then somebody else would take it over, probably Columbia." This, Kern interprets as

establishing the fact that the Kentucky purchase of the Armco properties was for the primary benefit of Inland. Kern relies also upon a deposition of Frederick W. Wright, a director of Inland in 1927–1928, taken on June 16, 1952. Wright had voted against approval by Inland of the intercompany contract. Twenty-five years later, he undertook to explain that he thought that contract, with its priority to Inland, was unfair to Kentucky. The District Judge considered his evidence incredible. It seems so to us, in view of the fact that Wright's obligation as a director of Inland was to Inland and not to Kentucky. Howell's later testimony does not square with his earlier acts.

In further support of his charge that the intercompany agreement was for the primary benefit of Inland, Kern reasons that without the intercompany contract Kentucky would have sold Armco that company's total needs for gas up to its capacity to produce it from the acquired properties and since the reserves had been estimated at 212,000,000,000 cubic feet, enough to have produced 17,000,-000 cubic feet a day, Inland, would then sell Armco only such quantities of gas as Armco needed but Kentucky could not produce, which, if the estimates of reserves were right, might well be none at all. By the intercompany contract this situation was reversed and if Armco needed any gas Inland would sell it the first 6,000,000 cubic feet a day and Kentucky would sell Armco only what it needed in excess of that amount, if any.

■ We are considering, however, an integrated fuel system concededly under common control and Kern's case completely falls without recognition of such control. Because of it, the two companies had a fiduciary relationship each to the other. For Kentucky to have purchased the property, to have secured from Armco an agreement that it would supply all of Armco's needs, and developed the property to its full capacity, as was of course contemplated, would have deprived Inland of a market, vital

to it, have been a breach of such obligation, and have resulted in a recoverable obligation against Kentucky and its directors.

The priority given to Inland in the marketing of the first 6,000,000 cubic feet per day to Armco, whatever may now be said of it, was in essence primarily for the protection of Kentucky and its security holders. Kentucky could not by its purchase of the Armco properties and its supply contract with Armco impair or destroy Inland without being held accountable for any injury its operations might inflict. It is, of course, true that Kentucky's share in the Armco market was the more speculative element in the agreement but its prospective benefits were the greater and Inland surrendered all expectation of selling to Armco more than 6,000,000 cubic feet per day. Kentucky was not the instrumentality of Inland. Both were instrumentalities of those who had put together the American Fuel System, and who were expanding its activities. We agree with the view of the SEC that the instrumentality rule applied in Overfield v. Pennroad Corp., D.C. 42 F.Supp. 586 does not apply.

There is no substantial proof that the Armco properties were purchased for the primary benefit of Inland or that the consideration paid for it by Kentucky was clearly beyond a reasonable estimate of its worth at the time. When they were bought, there were thirty producing wells upon the property and the engineer's report contemplated the drilling of over 700 wells. Although the estimates as to reserves were not available at the date of the option, they became available before the purchase contract was finally entered into. There was concern over the possibility that Armco might develop the property to a stage in which it could fully supply its own needs without relying upon its purchasing contract with Inland. The estimate as to the valuation of the Armco properties was made by an independent appraiser whose competence Kern does not question. Howell had testified that others had been after the property; that Co-

lumbia was interested in it; and that one bidder was prepared with a certified check as a down payment on a purchase price in the neighborhod of $2¼ million. The fact that Armco had paid little for the land and had carried it upon its books and in its capital gain return at substantially its own development costs has no relevance whatsoever to the value of the property at the time of its purchase by Kentucky. Indeed, one witness relied upon by Kern affirmed that Armco had always owned it with title going back to Henry Clay. It is, of course, true that the purchase proved to be improvident and that the estimate of reserves had turned out to be optimistic but the estimate of its value at the time of the purchase must be viewed in the light of the promotional climate of the times in which it was made and its subsequent history in the light of Columbia's illegal practices, which killed the Detroit project, and the unprecedented economic depression which so soon followed its acquisition.

The findings of the district court that there was no unfairness to Kentucky in the purchase of the Armco properties nor in the intercompany contract must be upheld. The issue of fairness is one of fact, findings thereon may not be set aside unless clearly erroneous, and error is not by this test here perceived.

So, viewing the meritorious question presented by the appeal, we find it unnecessary to enter upon a discussion of controversial issues tendered by the Green Committee in respect to laches, res judicata, or the statute of limitations. Nor do we perceive error in the court's refusal to appoint an independent trustee for Kentucky or independent counsel on behalf of Kentucky. Neither trustee nor his counsel has any personal interest in the controversy and the ability, good faith or disinterestedness of neither is impugned. The District Judge has lived with this case since 1930. He has explored every angle of it. A successor trustee would require many months, if not indeed years, to acquaint himself

with all of its intricacies. The present trustee has devoted unusual skill and energy to reclaiming the properties that are basic to the success of the reorganization plan, and his efforts have been repeatedly approved by creditors' committees, by the District Judge and by us. Nothing but delay could be achieved by an independent trustee or independent counsel for Kentucky. Finally, it must be observed that Kern's claim was never brought to the trustee's attention from 1941 to 1952, nor previously by his predecessors in the ownership of his bonds, although the precise facts upon which he bases his claim had been presented by the trustee to the court in a somewhat analogous controversy. The several orders challenged by Kern's appeal are,

Affirmed.